2012 VT 105

## State of Vermont v. Dennis P. Tribble

[67 A.3d 210]

No. 10-021

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed December 21, 2012

Motion for Reargument Denied January 28, 2013

*Christopher C. Moll*, Lamoille County Deputy State's Attorney, Hyde Park, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, and *Dennis P. Tribble*, Pro Se, Beattyville, Kentucky, for Defendant-Appellant.

¶ 1. **Robinson, J.** The main issue in this case is whether the trial court's admission of a videotaped deposition of a key State witness who was out of the country but willing to travel to the trial violated defendant's constitutional right to confrontation where defendant personally objected to admission of the testimony on the record, but his counsel stipulated to the videotape's admission. We conclude that defendant's rights were violated by the admission of the hearsay testimony and, accordingly, reverse. Because the issue is very likely to arise on remand, we also consider defendant's claim that the trial court erred in permitting defense counsel to raise a diminished capacity defense over defendant's objection, concluding that the decision should have been left to defendant.

¶ 2. Defendant Dennis Tribble was charged with first-degree murder for killing Michael Borello and was convicted of second-degree murder. He appeals that conviction.[1]

¶ 3. That defendant killed Mr. Borello is not in dispute. After the shooting, defendant drove to the sheriff's office and told the dispatcher working the desk that he "shot [his] neighbor." The circumstances surrounding that killing are very much in dispute.

¶ 4. Defendant's case can be summarized as follows. In 1992, defendant purchased a parcel of land on Jones Lane, a dirt road in a secluded, sparsely populated, off-the-grid area in Wolcott. He did not move there until late 1998 or early 1999. Defendant developed a host of grievances against others in the very rural neighborhood, including, Mr. Borello and his family in particular. He alleged they were involved with drugs; they were loud; they were rude to him; Mr. Borello's son drove too fast on their road, doing gravel spins; they burned large quantities of trash; and they were polluting the underground water on his lawn. Defendant claimed Mr. Borello was particularly hostile to him, and on two occasions Mr. Borello fired multiple pistol shots while in defendant's vicinity to intimidate defendant. One of those times, Mr. Borello drove his car by defendant and gave him the finger with both hands. Not long before their final confrontation, Mr. Borello "got in [his] face" because defendant stopped waving at the Borellos. Mr. Borello had confronted defendant a number of times like that — with increasing frequency and severity in the months leading up to their final confrontation. Defendant complained repeatedly about various offenses to Mr. Borello directly, to the Lamoille County Sheriff's Department on multiple occasions, and to environmental authorities, but the problems persisted, and he felt like nobody was doing anything about them.

¶ 5. According to defendant, the issues came to a head on September 26, 2000. Hostilities had escalated, and Mr. Borello had

---

[1] This was defendant's second jury trial in connection with the same events. Defendant was initially charged with first-degree murder. In the lead-up to trial, defendant asserted irreconcilable conflicts with each of the respective lawyers the court appointed to represent him; the trial court ultimately concluded that defendant had waived his right to counsel and tried defendant without counsel. Defendant declined to participate in the proceedings, and was tried and convicted of first-degree murder. In 2005, we reversed defendant's conviction on the ground that the trial court's decision to proceed without counsel was error. See *State v Tribble*, 2005 VT 132, 179 Vt. 235, 892 A.2d 232. The retrial on remand led to the second-degree murder conviction at issue here.

threatened defendant several times over the preceding twenty-four hours, including telling him that defendant was "dead meat." In general, defendant had come to believe that his life was in danger living on Jones Lane. So when he went to chop wood by the road that day, he took his pistol with him in addition to his shotgun because he was worried about his safety. While defendant was splitting wood near the back of his truck by the side of the road, Mr. Borello drove slowly past him and stopped his car. Defendant got his pistol from the truck when he realized Mr. Borello was stopping. Mr. Borello got out of his car and came toward him, screaming. Defendant described Mr. Borello as angry and "purple in the face." Defendant moved backwards down a short embankment; as Mr. Borello pursued, defendant drew his gun. Defendant brandished his pistol, and when Mr. Borello looked like he was about to continue down the embankment, from about six feet away defendant shot Mr. Borello in the buttock in the hope that Mr. Borello would leave. Not knowing whether he had hit Mr. Borello, and given that Mr. Borello started to lunge again, defendant tried to fire a second shot, but his pistol jammed.

¶ 6. Mr. Borello then turned and ran quickly back to his car, and defendant retrieved his shotgun from his own truck. As Mr. Borello approached his own car, defendant feared that Mr. Borello was retrieving a weapon. When Mr. Borello did not heed defendant's instruction not to approach Mr. Borello's car door, defendant shot him in the hip with his shotgun. At that point, defendant allowed Mr. Borello to leave the scene. Mr. Borello ran away without difficulty, but bypassed the best route to his house and instead went around the curve and stepped on the running board of an abandoned dump truck body on another neighbor's property. Because he thought Mr. Borello was still a threat, defendant followed, instructing him to get away from the truck and shooting again with the shotgun when he did not. When Mr. Borello squared up to defendant and started to come at him, defendant shot him in the chest from a distance of six or seven feet. Mr. Borello fell at that point. Throughout the entire encounter, defendant felt threatened by Mr. Borello.

¶ 7. Although defendant wanted to focus his case solely on his self-defense claim, over his objection, defense counsel presented testimony of diminished capacity. Two different psychiatric experts for the defense testified that defendant suffered from a type of delusional disorder that included a fixed belief that someone wants

to harm him, with an additional diagnosis of paranoid personality disorder. Because of his condition, defendant believed he needed to shoot and possibly kill Mr. Borello in order to protect himself. Defendant's delusional disorder accounts for defendant's belief that when Mr. Borello tried to go to his car, and when he then went to the abandoned dump truck, he was going to get a weapon. People who are delusional see a threat when there is no threat. Mr. Tribble himself testified that he did not suffer from a delusional disorder and was vigilant but not paranoid; defense experts testified that his belief that he was not delusional was not surprising given his disorder.

¶ 8. Defendant was the only surviving witness to the event, although one neighbor heard gun shots, and, from a distance, through a break in the trees, very briefly saw someone run up the road toward the dump truck, shouting, "Get out of here." Moments later, the person ran back the other way.

¶ 9. The State's witnesses portrayed defendant as more of an aggressor relative to Mr. Borello and others. Various neighbors testified that they had never seen Mr. Borello threaten or disrespect defendant or anyone else, but that they had heard defendant complain many times about the Borellos. One neighbor described an incident in 2000 in which defendant initiated a verbal exchange of obscenities as Mr. Borello drove by, a time when defendant brandished a club and remarked to the neighbor that he, defendant, was taller than Mr. Borello, and an occasion when defendant showed his new shotgun and made a remark about the ease of killing someone. Another neighbor testified that shortly before the killing, defendant complained to her about the Borellos and told her he wanted to kill Mr. Borello's son, and that it would be easy to hide a body in the swamp. A state environmental officer testified that once when he was driving on Jones Lane, in street clothes and a Jeep Cherokee, a man, whom he later came to know as Mr. Tribble, walked into the road, stopped his car, and questioned him about who he was and why he was there in a way that made him uncomfortable.

¶ 10. Mr. Borello's son testified that defendant frequently stopped them on the road, swore a lot, and complained about one thing or another. It was normal for defendant to be "mouthy, upset, enraged, [and] hot off the handle," but at some point defendant turned his rage toward Mr. Borello and his son. On the day of the killing, the son was driving down the road in his

father's truck, and defendant pulled into the road right in front of him, forcing him to begin to stop. After making eye contact, defendant pulled back into his driveway and allowed the son to pass.

¶ 11. A young man who was visiting a family, the Manoshes, on Jones Lane the day of the killing testified that as he was driving down the road, defendant was standing in the middle of the road waving his hand; when the young man pulled over, defendant asked him why the Manoshes were not doing anything about Mr. Borello's throwing trash on their and defendant's property. Defendant got progressively angrier, and said that if Mr. Borello kept on throwing trash on his property, defendant was going to kill him. Shortly thereafter, the young man encountered Mr. Borello's daughter on the road and relayed the threat. She saw her father, Mr. Borello, moments after, but does not recall with confidence whether she passed the information about Mr. Tribble's threat on to her father.

¶ 12. The State introduced physical evidence and observations from the scene to undermine defendant's account. The shell casing linked to defendant's first pistol shot was found at the edge of the road. Given ballistics testimony that defendant's pistol discharged cartridges to the rear and right of the shooter, the location of the shell casing undermined defendant's testimony that he had backed down the embankment away from the road before firing his pistol at Mr. Borello. Likewise, direct observations by one witness contradicted defendant's report immediately after the incident that, as he backed away from the road and down the embankment, he found himself in standing water, overtopping his boot. And no weapons of any sort were found in Mr. Borello's car or the abandoned dump truck.

¶ 13. Dr. Morrow, a forensic pathologist and Vermont's Chief Medical Examiner at the time of the killing, testified that Mr. Borello's wounds signaled that he had been shot once with a pistol and four times with a shotgun. In particular, Mr. Borello was shot in the hip with a pistol, with an exit wound through his buttocks. Mr. Borello was shot once in the back of the head and neck area with a shotgun; once in the shoulder and arm with a shotgun; once in the side and stomach with a shotgun; and once in the chest with a shotgun. Dr. Morrow testified that the pellet wounds from a shotgun were scattered over surfaces of the body, predominantly the back of the head and neck, on the right shoulder

and arm, and on the back of the body from the shoulder blades to the back of the thigh. The trajectory of the pellets that grazed or hit Mr. Borello's torso was back to front. The pistol shot and first three shotgun shots likely caused Mr. Borello considerable pain, but would not likely have been fatal. The final shotgun shot to Mr. Borello's chest injured his heart and likely killed him immediately. The fatal shotgun blast was likely shot from an intermediate range, from five to twelve feet away, and hit Mr. Borello on a trajectory that would have been essentially level relative to a position in which Mr. Borello was standing erect. The pellets were two different colors, meaning the shotgun had been reloaded between shots. Among other things, Dr. Morrow's testimony undermined defendant's claim that he acted in self-defense, and that Mr. Borello was lunging at him during the altercation.

¶ 14. The State also relied on defendant's description of the confrontation to police officers shortly after the shooting; the prior statements were arguably inconsistent with his trial testimony in meaningful ways, including his description of the initial encounter with Mr. Borello. And the State argued that defendant's pursuit of Mr. Borello when Mr. Borello retreated down the road defeated the self-defense claim and supported the State's assertion that defendant intentionally killed Mr. Borello.

¶ 15. With respect to the diminished capacity defense, the State presented two expert witnesses who testified that defendant was not delusional and had the ability to form the various levels of intent to support conviction for first- or second-degree murder. The State's experts testified that defendant had a paranoid personality disorder, but was not delusional, and that defendant had the capacity to act willfully and to premeditate.

I.

¶ 16. We first address defendant's Confrontation Clause claim. Over defendant's objection, defense counsel and the State stipulated to allow the State to take a preservation deposition of a critical witness for use in lieu of live testimony at trial. In November 2008, the State filed a "Notice of Intent to Use Deposition to Preserve Testimony" of the former Chief Medical Examiner who performed Mr. Borello's autopsy. In the notice, the State asserted that "Dr. Morrow will be unavailable for trial as he will be working and residing in New Zealand from February 2009 through June 2009." The State proposed to conduct a preservation

deposition before Dr. Morrow's departure or, in the alternative, to present live testimony during trial via video-conferencing. The State appended to its notice an e-mail from Dr. Morrow describing his constraints:

> As we discussed, I will be working . . . in Auckland, NZ at the time of trial. . . . It would be immensely inconvenient for my employer . . . and me, as well as inconvenient and potentially quite expensive for the State . . . to require me to appear in person at the trial. . . . I will be instate [sic] and available until Dec 30 to provide video taped preservation testimony at any mutually convenient time . . . Alternatively, I would make myself available for a live video or telephonic link to the Vermont court from Auckland . . . .
>
> . . . .
>
> If required to fly from New Zealand, I would require a business class ticket in order to be appropriately articulate in my testimony . . . . These were the arrangements used in State vs Godfrey . . . .

Defendant personally filed a memorandum in opposition and asked the court to disallow a preservation deposition and either compel Dr. Morrow's presence at court or prohibit the introduction of his testimony.

¶ 17. At a hearing on the issue, defense counsel confirmed his agreement to the State's motion, saying the motion was not unreasonable. Counsel noted defendant's displeasure with counsel's stipulation to allow Dr. Morrow's testimony by videotape. At that same hearing, defendant personally addressed the court and objected to his attorney's stipulation to the taking of Dr. Morrow's deposition in lieu of being present at trial, stating that the witness's presence at trial was his "Constitutional Right." Defendant insisted, "I have a right to confront this man . . . . At the trial, he should be present at the trial."

¶ 18. The trial court allowed the preservation deposition and introduction of the videotaped testimony, noting that in light of Dr. Morrow's absence from the country, "with or without the stipulation, the court would approve the deposition for preservation." In its written order, the trial court found that the witness would be absent from the country at the time the case was

scheduled for trial, and overruled defendant's Confrontation Clause objection noting that defendant would be transported to be present for the deposition, the court would be available to rule on objections, and the deposition would be video recorded for playback at trial.

¶ 19. At trial, the State played Dr. Morrow's prerecorded video testimony before the jury. The exhibits about which Dr. Morrow testified were shown on a screen for the jury to view as Dr. Morrow testified about each in the video.

¶ 20. The question on appeal is whether the trial court's decision to admit Dr. Morrow's videotaped preservation deposition testimony over defendant's objection was reversible error. We review the factual findings underlying the trial court's analysis for clear error, and review de novo the court's legal conclusions concerning defendant's Confrontation Clause challenge. See *State v. Shea*, 2008 VT 114, ¶ 8, 184 Vt. 453, 965 A.2d 504.

■ ¶ 21. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause guarantees criminal defendants the right to confront those who "bear testimony" against them. *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (quotation omitted). The United States Supreme Court has reiterated that "[a] witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). This Confrontation Clause requirement applies to out-of-court statements introduced at trial as well as in-court statements, *Crawford*, 541 U.S. at 50-51, and it applies to testimonial statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," including prior deposition testimony. *Id.* at 51-52.[2] In

---

[2] The Court has not extended the Confrontation Clause requirements to *nontestimonial* out-of-court statements or to testimonial statements offered for a purpose other than the truth of the matter asserted. See, e.g., *Davis v. Washington*, 547 U.S. 813, 822 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an

*Crawford*, the Court expressly abrogated its own prior ruling that had allowed admission of out-of-court statements not subject to confrontation, even if they were testimonial, if they bore sufficient indicia of reliability. 541 U.S. at 60-69.

¶ 22. The Supreme Court has declined to make an exception to this rule for expert scientific testimony. In *Melendez-Diaz*, the Court considered a case in which the trial court had admitted reports, prepared by state lab analysts, certifying that a specific substance was cocaine. The state argued that the above requirements did not apply because (1) the analysts were not "accusatory" witnesses in that they did not directly accuse the defendant of wrongdoing, 557 U.S. at 313; (2) their analyses were not the sort of conventional out-of-court testimony with which the Confrontation Clause is concerned, *id.* at 315-16; and (3) their testimony was not offered in response to interrogation, *id.* at 316-17. The Court rejected these arguments, and expressly declined to view scientific testimony as different from other testimony subject to the confrontation requirement, explaining: "Like the eyewitness who has fabricated his account to the police, the analyst who provides false results may, under oath in open court, reconsider his false testimony." *Id.* at 319. Moreover, the Court emphasized that the right of confrontation does not arise only when the reliability of testimony is in question: "[W]e would reach the same conclusion if all analysts always possessed the scientific acumen of Mme. Curie and the veracity of Mother Theresa." *Id.* at 319 n.6; accord *Bullcoming v. New Mexico*, ___ U.S. ___, ___, 131 S. Ct. 2705, 2710 (2011) (surrogate analyst from lab that performed blood alcohol content testing not adequate substitute for analyst who prepared report because "[t]he accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist").[3]

---

ongoing emergency."); *Williams v. Illinois*, ___ U.S. ___, ___, 132 S. Ct. 2221, 2235-41 (2012) (DNA expert's testimony that DNA profile from semen sample conducted by lab matched defendant's DNA profile that was properly in evidence did not violate defendant's right to confront lab that prepared profile of semen sample because profile itself was not admitted for truth of matter asserted therein but, rather, constituted hypothetical data that formed basis for expert's opinion regarding match).

[3] Distinguishing its holdings in *Melendez-Diaz* and *Bullcoming* and providing an additional rationale for its decision in *Williams,* the Supreme Court has recently

■ ¶ 23. Although in *Crawford* and *Melendez-Diaz* the Court considered out-of-court testimony that had not been subjected to cross-examination, the Court's discussions in both cases make it clear that, when a witness is available for trial, the Confrontation Clause requires live testimony *at trial*, even when a defendant did have a prior opportunity to cross-examine the witness. In *Melendez-Diaz*, the Court required that the defendant be confronted "at trial" and held that *both* the prior opportunity to cross-examine *and* unavailability at trial were necessary conditions for escaping the in-trial confrontation requirement. 557 U.S. at 311; see also *id.* at 311 n.1 ("[W]hat testimony [regarding chain of custody] *is* introduced must (if the defendant objects) be introduced live."); *Crawford*, 541 U.S. at 59 ("Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.").

■ ¶ 24. The Court's conclusion that even out-of-court testimony previously subject to cross-examination by defendant may be considered at trial only if the witness is unavailable is consistent with its recognition that the significance of "confrontation" is not limited to the interaction between, and effect on, the witness and defendant; the United States Supreme Court has repeatedly recognized that the presence of the factfinder is part and parcel of an effective exercise of the Confrontation Clause right. See, e.g., *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) (Sixth Amendment was designed to prevent use of "depositions or *ex parte* affidavits . . . against [a] prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner

---

carved out a limited exception that would allow for admission without confrontation of a report of a DNA profile drawn from semen found on a rape victim where the profile was generated for the purpose of catching an at-large perpetrator, not to accuse the defendant or to create evidence for use at trial. *Williams*, ___ U.S. at ___, 132 S. Ct. at 2227-28. The Court noted that at the time the lab generated the profile the defendant was neither in custody nor under suspicion and no one at the lab could possibly have known the profile would inculpate defendant or any other particular person. *Id.* at ___, 132 S. Ct. at 2243-44.

in which he gives his testimony whether he is worthy of belief"). Accordingly, the United States Supreme Court has held that it would not allow admission of the transcript of a preliminary hearing of an accused's codefendant, even if accused's counsel had cross-examined the codefendant at that hearing, where there was no showing that the codefendant was unavailable to testify. *Barber v. Page*, 390 U.S. 719, 725 (1968) ("The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness.").

■ ■ ¶ 25. In *Coy v. Iowa*, the Supreme Court emphasized that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." 487 U.S. 1012, 1016 (1988). In that case, the Court explained:

> It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly. The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. Thus the right to face-to-face confrontation serves much the same purpose as a less explicit component of the Confrontation Clause that we have had more frequent occasion to discuss — the right to cross-examine the accuser; both "ensur[e] the integrity of the fact-finding process."

*Id.* at 1019-20 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987)). Two years later the Court reinforced this view, explaining, "The combined effect of these elements of confrontation — physical presence, oath, cross-examination, and observation of demeanor by the trier of fact — serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Maryland v. Craig*, 497 U.S. 836, 846 (1990).

¶ 26. In light of these principles, other courts facing circumstances similar to this case have declined to admit at trial prior deposition testimony, even if it was subject to cross-examination by defendant, absent a showing that the witness is unavailable to testify at trial. For example, the United States Court of Appeals

for the Ninth Circuit concluded that the district court had committed plain error in admitting at trial depositions that had been taken pursuant to court order to preserve the testimony of witnesses who were expected to be unavailable for trial without first requiring the government to establish that the witnesses were in fact unavailable. *United States v. Matus-Zayas*, 655 F.3d 1092, 1101 (9th Cir. 2011).

■ ¶ 27. Likewise, the United States Court of Appeals for the Sixth Circuit affirmed a grant of habeas relief to a defendant convicted based, in part, on the videotaped testimony of a witness who was incarcerated out of state at the time of trial; although defendant cross-examined the witness in the pretrial deposition, the state failed to establish at trial that the witness was unavailable in the constitutional sense. *Brumley v. Wingard*, 269 F.3d 629, 641 (6th Cir. 2001). The court explained, "[I]n conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* at 639 (quotation omitted). The court acknowledged that the videotaped testimony — taken under oath and subject to cross-examination, with a court available to rule on objections — did not implicate many of the concerns underlying the Confrontation Clause, but recognized that even the videotape could not satisfy the Confrontation Clause's "preference for face-to-face confrontation *at trial.*" *Id.* at 642 (quotation omitted). Accordingly, the court concluded, "[T]he *knowing preparation* of a videotaped deposition as a substitute for the trial testimony *of a constitutionally available witness* is inconsistent with the values of the Confrontation Clause, despite reduced concerns with reliability." *Id.*

■ ¶ 28. For these reasons, we conclude that absent a valid waiver, the Constitution does not except "preservation deposition" testimony from the requirements of the Confrontation Clause.[4] Accordingly, we consider three questions: (1) whether Dr. Morrow

---

[4] In the civil context, we have noted that there is no meaningful distinction between an ordinary deposition and one characterized as a deposition for "preservation" purposes. See *Nichols v. Brattleboro Retreat*, 2009 VT 4, ¶ 4 n.1, 185 Vt. 313, 970 A.2d 1249.

was "unavailable"; (2) if not, whether defense counsel's stipulation to allow Dr. Morrow's preservation deposition to be admitted at trial in lieu of his actual presence, over defendant's objection, was an effective waiver of defendant's Confrontation Clause rights; and (3) if not, whether the error was constitutionally harmless.

## A.

¶ 29. The United States Supreme Court held that a witness is not "unavailable" for purposes of the exception to the confrontation requirement "unless the prosecutorial authorities have made a good-faith effort" to secure the witness's presence at trial. *Barber*, 390 U.S. at 724-25. In the *Barber* case, a defendant was convicted after an Oklahoma trial court admitted the transcript of a critical witness's testimony from a preliminary hearing in the case because that witness was incarcerated in Texas at the time of trial. The Supreme Court reversed the lower federal court's denial of habeas corpus relief, noting that "the sole reason why [the witness] was not present to testify in person was because the State did not attempt to seek his presence." *Id.* at 725. The Court admonished, "The right of confrontation may not be dispensed with so lightly." *Id.*

¶ 30. The Court further elaborated on the "unavailability" requirement in *Ohio v. Roberts*:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

448 U.S. 56, 74-75 (1980) (quotations omitted), *overruled on other grounds by Crawford*, 541 U.S. at 60-69. In *Roberts*, the Court

concluded that the prosecutor's multiple attempts to serve subpoenas on the witness at her last known address, its outreach to the witness's parents well in advance of the trial, and its voir dire of the parents who testified that they had not been able to locate their daughter for over a year, all supported the conclusion that the prosecutor had undertaken a good-faith effort to bring the witness to court so that the witness was unavailable for the purpose of the Confrontation Clause analysis. *Id.* at 76-77.

¶ 31. We have decided several cases raising the issue of whether a witness is unavailable for Confrontation Clause purposes. In *State v. Lynds*, the State wrote a letter to its expert in a child sexual abuse case informing her of the trial date six weeks before the trial. 158 Vt. 37, 40, 605 A.2d 501, 502 (1991). Two weeks before the trial, and again five days before the trial, prosecutors left the expert phone messages. *Id.* The State finally reached its expert witness two days before trial, only to learn that she would be out of state on the day of trial and would not return until nearly a week after the trial. *Id.* The trial court granted the State's motion, over the defendant's Confrontation Clause objection, to admit the expert's deposition testimony in the trial. We reversed. Noting that "a witness who will be inconvenienced by appearing . . . is not unavailable," we concluded that "[t]he State's effort was not sufficiently diligent to satisfy the unavailability requirement." *Id.* at 41-42, 605 A.2d at 503 (citations omitted).

¶ 32. In *State v. Carroll* the State used the Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Cases, 13 V.S.A. § 6646, to ensure its key witness's presence at trial. 147 Vt. 108, 110, 513 A.2d 1159, 1160 (1986). However, due to a failure of communication between defendant and his lawyer regarding the trial date, defendant was not present in court on the initial trial date. Before the witness left to return to Colorado, the State moved to take the witness's deposition " 'in order to preserve necessary testimony in the event the State cannot afford to fly 'the witness' back to Bennington a second time.' " *Id.* The court granted the motion and admitted the deposition testimony at the rescheduled trial. We reversed. Noting the United States Supreme Court's admonition that "[w]here a witness is absent from the jurisdiction, 'the government must show that it has engaged in a diligent effort to locate and procure the witness' return,' " we concluded that the State had made no

effort to secure the witness's presence at the rescheduled, actual trial. *Id.* at 112-13, 513 A.2d at 1161 (quoting *Roberts*, 448 U.S. at 79).

¶ 33. Considering these cases, we cannot conclude based on the evidence in the record that Dr. Morrow was unavailable. Dr. Morrow indicated that attending the trial in person "would be immensely inconvenient" for him and his employer, but also undisputedly indicated his willingness to return from New Zealand for the trial and that he would require a business class ticket. The State knew where Dr. Morrow was, and Dr. Morrow was willing to testify at the trial if the State made the necessary arrangements. There is no evidence that Dr. Morrow required the State to invoke any formal process to secure his attendance. The only two impediments to Dr. Morrow's testifying at the trial were inconvenience and cost. We have expressly rejected both of these as factors sufficient to support a finding of unavailability. See *Lynds*, 158 Vt. at 41, 605 A.2d at 503 (inconvenience is not tantamount to unavailability), *Carroll*, 147 Vt. at 110-11, 513 A.2d at 1160-61 (admission of preservation deposition undertaken to avoid cost of flying witness back to Vermont was error).[5] Accordingly, we conclude that the trial court's determination that Dr. Morrow was unavailable is unsupported by the record and erroneous as a matter of law.[6] For that reason, admission of Dr. Morrow's out-of-court testimony violated defendant's Confrontation Clause rights absent an effective waiver of those rights.

---

[5] Even if Dr. Morrow had balked at attending, the State received notice of his planned travel to New Zealand well before Dr. Morrow left the country, and well before trial. In its brief, the State acknowledges "without question" there is a mechanism and ability for Vermont to engage in a procedure to have New Zealand compel Dr. Morrow's attendance, but asserts that "in light of the time frames involved, it was a paper tiger." This bare assertion would be insufficient to satisfy the State's burden to demonstrate a good faith effort.

[6] We have relied on case law applying constitutional principles in analyzing whether the witness was unavailable. We note that Vermont Rule of Criminal Procedure 15(j) supports the same conclusion. Under that rule, a witness who is absent from the hearing is unavailable when the inability to be present is due to death or physical or mental illness, or when the proponent of the deposition has been "unable to procure [the witness's] attendance by process or other reasonable means." In this case, the State did not establish unavailability under this standard.

## B.

¶ 34. We next consider defense counsel's stipulation, over defendant's objection, to admit the preservation testimony of Dr. Morrow in lieu of his presence at trial. We must decide whether a defendant's attorney can waive a defendant's Confrontation Clause rights in the face of a defendant's objection to such a waiver.

¶ 35. The right to confrontation is a fundamental constitutional right. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). Fundamental constitutional rights, including the right to confrontation, can undoubtedly be waived. See, e.g., *Boykin v. Alabama*, 395 U.S. 238, 243 (1969) (valid guilty plea entails waiver of three constitutional rights: privilege against self-incrimination, right to jury trial, and right to confront one's accusers); *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938) (criminal defendant may waive Sixth Amendment right to counsel); see also *State v. Koveos*, 169 Vt. 62, 67-68, 732 A.2d 722, 726 (1999) (defendant could not argue that he was denied his right to confront witness when he specifically agreed to procedure that allowed admission of pretrial deposition without live testimony of witness). Like any waiver of a constitutional right, a defendant's waiver of the right to confrontation must be an "intentional relinquishment or abandonment of a known right or privilege." *Johnson*, 304 U.S. at 464.

¶ 36. Most courts have recognized the validity of an attorney's waiver of the right to confrontation on a defendant's behalf. See, e.g., *People v. Campbell*, 802 N.E.2d 1205, 1210 (Ill. 2003) ("[A] majority of the courts that have addressed the issue have held that counsel in a criminal case may waive [a] client's sixth amendment right of confrontation by stipulating to the admission of evidence.").[7]

---

[7] The United States Court of Appeals for the Eighth Circuit once suggested that counsel could not waive the confrontation right. *Clemmons v. Delo*, 124 F.3d 944, 956 (8th Cir. 1997) ("[T]he law seems to be clear that the right of confrontation is personal and fundamental and cannot be waived by counsel."). However, since that time, that court has held otherwise. See, e.g., *United States v. Holmes*, 620 F.3d 836, 843 (8th Cir. 2010) ("Counsel can waive a defendant's right to confrontation as long as the decision is made for tactical reasons and the defendant is aware of the waiver and does not object."); see also *Hatley v. State*, 722 S.E.2d 67, 71 (Ga. 2012) ("The trial court should take reasonable steps to ascertain, and put on the record, whether the defendant waives his right to confront the child witness.").

■■■ ¶ 37. However, courts that have recognized the validity of an attorney's waiver of a defendant's right to confrontation have consistently held that the waiver is ineffective where the defendant dissents from or objects to the attorney's decision. See, e.g., *United States v. Williams*, 632 F.3d 129, 133 (4th Cir. 2011) ("We can find no reasoning or case law that would uphold a waiver of a Sixth Amendment right by defense counsel over a defendant's objection."); *United States v. Williams*, 403 F. App'x 707, 708 (3d Cir. 2010) ("The validity of counsel's waiver depends on whether the defendant dissented from his counsel's decision and whether counsel's decision was a legitimate trial tactic or part of a prudent trial strategy."); *Holmes*, 620 F.3d at 843; *Hawkins v. Hannigan*, 185 F.3d 1146, 1155-56 (10th Cir. 1999) (where defense counsel's decision to enter stipulation to allow admission of hearsay testimony was prudent trial decision and the record reflected no dissent from defendant, waiver of confrontation rights was effective); *United States v. Stephens*, 609 F.2d 230, 232-33 (5th Cir. 1980) ("[C]ounsel in a criminal case may waive [the] client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from [the] attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy."); *Wilson v. Gray*, 345 F.2d 282, 287-88 (9th Cir. 1965) (where defendant's attorney stipulated to introduction of transcript of preliminary hearing at trial in the presence of defendant, defendant did not object, and decision to stipulate was deliberately made as a matter of trial tactics and strategy, attorney's stipulation on behalf of defendant was valid); *United States v. Joseph*, 333 F.2d 1012, 1013 (6th Cir. 1964) ("[Confrontation] right may be effectively waived by counsel in open court in the presence of [a defendant] who indicates no dissent."); *Cruzado v. People of Puerto Rico*, 210 F.2d 789, 791 (1st Cir. 1954) (upholding counsel's waiver of confrontation rights through stipulation to admit testimony from other court hearings, and explaining, "If the accused, being present, manifests no dissent, it is usually fair to assume that [the accused] approves of, or at least acquiesces in, the decisions taken in open court in [defendant's] behalf by [defense] counsel."); *People v. Clendenin*, 939 N.E.2d 310, 323 (Ill. 2010) (defense counsel may waive defendant's confrontation right where "(1) the defendant does not object to the stipulation; *and* (2) the decision to stipulate is a matter of trial

tactics and strategy."); *People v. Buie*, 817 N.W.2d 33, 44 (Mich. 2012) ("[W]here the decision constitutes reasonable trial strategy . . . the right of confrontation may be waived by defense counsel as long as the defendant does not object on the record."). We have found no authority to support the proposition that counsel can stipulate to the admission of out-of-court testimony thereby waiving defendant's Confrontation Clause rights in the face of defendant's express objection.[8]

■ ¶ 38. This record leaves no doubt that defendant dissented from his attorney's decision to stipulate to the admission of pretrial deposition testimony of Dr. Morrow in lieu of the expert's actual presence at trial — in effect waiving defendant's right to confront Dr. Morrow at trial. Assuming, without deciding, that counsel can in some circumstances stipulate to a waiver of defendant's Confrontation Clause rights pursuant to a prudent trial strategy, in this case, where defendant timely objected to such a waiver on the record, the purported waiver is invalid. Accordingly, the trial court erred in admitting the out-of-court testimony of Dr. Morrow over defendant's objection.

C.

■ ¶ 39. The remaining question in the Confrontation Clause analysis is whether the error was harmless beyond a reasonable doubt. See *State v. Carter*, 164 Vt. 545, 553, 674 A.2d 1258, 1264 (1996) (constitutional error "may be found harmless only if the appellate court can state 'a belief that it was harmless beyond a reasonable doubt.'" (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967))); *State v. Oscarson*, 2004 VT 4, ¶ 30, 176 Vt. 176, 845

---

[8] One possible outlier is the United States Court of Appeals for the Second Circuit, which held, "We therefore join the majority of circuit courts of appeals and hold that defense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound." *United States v. Plitman*, 194 F.3d 59, 64 (2d Cir. 1999). Although that court did not expressly condition the effectiveness of the waiver on the defendant's assent, or lack of dissent, that court does not appear to have intended to allow counsel to waive the confrontation right over defendant's express objection. The cases embraced by the Second Circuit, representing, in that court's words, "the majority of circuit courts of appeals," all included the proviso that a defendant's lack-of-objection was essential to an effective waiver. *Id.* Moreover, in *Plitman*, the court noted that the defendant was present at the pretrial hearing in which his counsel stipulated to the admission of certain hearsay testimony in lieu of a live witness, and did not object to his counsel's decision. *Id.* at 64.

A.2d 337 ("For the error to be harmless, the reviewing court must find beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error.").

¶ 40. We have recognized that when the error involves improper admission of evidence, the error cannot be harmless if " 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' "[9] *Carter*, 164 Vt. at 553, 674 A.2d at 1264 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963)). We thus review the record for harmlessness by analyzing whether, beyond a reasonable doubt, the jury would have convicted defendant of second-degree murder in the absence of Dr. Morrow's testimony. See *Coy*, 487 U.S. at 1022 ("[H]armlessness must . . . be determined on the basis of the remaining evidence."); *Oscarson*, 2004 VT 4, ¶ 31 ("[W]e must assess harmlessness by considering the likelihood of the conviction in the absence of the offending testimony."); *State v. Lipka*, 174 Vt. 377, 384, 817 A.2d 27, 34 (2002) ("To determine whether the error is harmless, we must posit a trial without any evidence by the witness who testified in violation of defendant's confrontation rights." (quotation and alterations omitted)). "The issue before us is what the jury might have done without the offending evidence, not what we would do if we were the factfinder." *Lipka*, 174 Vt. at 385, 817 A.2d at 34.

¶ 41. Our harm calculus is guided by a host of factors including: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Oscarson*, 2004 VT 4, ¶ 32 (quotation omitted). The two most important of these factors are "the overall strength of the State's case without the offending evidence and the strength of the offending evidence." *Id.*; see also *Lipka*, 174 Vt. at 385, 817 A.2d at 34.

¶ 42. A review of the State's closing argument confirms that Dr. Morrow's testimony was important to the State's case. The

---

[9] We note that in order for defendant to prevail on his reversible error claim, he need not demonstrate any prejudice in fact resulting from the Confrontation Clause violation.

State relied on Dr. Morrow's testimony about the trajectory of the pistol shot through Mr. Borello's hip and out his buttock to challenge defendant's claim that he fired that first shot as an angry Mr. Borello lunged toward him while defendant was backing down an embankment by the roadside. The State utilized Dr. Morrow's testimony on the superficial nature of most of the shotgun wounds, and his testimony that the bullet that went through Mr. Borello's body would have caused more heavy bleeding, to interpret the blood trail at the scene. And based on Dr. Morrow's testimony, the State called into question defendant's testimony that his first pistol shot did not seem to have any effect at all on Mr. Borello. The State reviewed in detail an exhibit admitted in connection with Dr. Morrow's testimony that identified the locations and trajectories of the bullet and pellet shots that hit Mr. Borello, and noted that most of the pellet wounds were in the back. The State also highlighted for the jury an x-ray, also admitted through Dr. Morrow, that depicted the pellets in Mr. Borello's head. The State pointed to Dr. Morrow's testimony about the trajectory of the final, fatal shotgun blast to argue that, when Mr. Tribble shot him at close range, Mr. Borello was upright, not running toward defendant in a "football stance" as defendant testified. Dr. Morrow's testimony was an important part of the State's case, especially insofar as it provided substantial support to the State's rebuttal of defendant's own account of his confrontation with Mr. Borello.

¶ 43. Dr. Morrow's testimony was not cumulative; although the fact that Mr. Borello died as a result of defendant's shots was not in dispute, nobody else testified in detail about the physical evidence in Mr. Borello's body and its significance relative to the crime scene. Defense counsel did conduct a thorough cross-examination of Dr. Morrow — the one factor that weighs in favor of a harmless error finding. The State's case was largely circumstantial. The jury heard Dr. Morrow's testimony that the final shotgun blast to the chest — after defendant said he followed Mr. Borello — was the cause of death; that the earlier shots, including the pistol shot that defendant described as his initial response to Mr. Borello's advances, were injurious but not deadly; that the pistol shot traveled into the side of Mr. Borello's hip and out his buttock — suggesting that Mr. Borello was not squarely advancing on defendant at the time defendant fired; and that the initial bullet shot and subsequent shotgun shots would likely have caused

Mr. Borello considerable pain — calling into question defendant's testimony that Mr. Borello appeared unimpaired after the first shot. Had the jury not heard this testimony, it may have reached different conclusions about what actually happened in the altercation between defendant and Mr. Borello and may well have reached a different conclusion as to Mr. Borello's state of mind and criminal responsibility. For these reasons, we cannot conclude beyond a reasonable doubt that in the absence of that testimony the jury would have convicted defendant of second-degree murder. *Lynds*, 158 Vt. at 42, 605 A.2d at 503 ("[A]n error cannot be harmless if there remains a possibility that the constitutionally-proscribed evidence impacted on the ultimate decisional process of the jury and the beneficiary of the error cannot refute that possibility beyond all reasonable doubt." (quotations and alterations omitted)). Accordingly, we must reverse defendant's conviction.

## II.

¶ 44. Conflict between defendant and his various lawyers regarding the assertion of mental-illness defenses has dogged this case from the outset. See *Tribble*, 2005 VT 132, ¶¶ 21-24 (reversing defendant's first-degree murder conviction based, in part, on trial court's decision to allow defense counsel to withdraw rather than defer to defendant's refusal to present insanity defense). The issue is likely to recur on retrial. For that reason, although we reverse on the basis of the Confrontation Clause violation, in the interest of judicial economy, we address defendant's claim that the trial court erred in allowing defense counsel to present a case of diminished capacity over defendant's objection. See *State v. Hazelton*, 2006 VT 121, ¶ 22, 181 Vt. 118, 915 A.2d 224 (addressing remaining legal claim, despite reversal on other grounds, because it was likely to arise in new trial).[10]

¶ 45. Although defendant was found competent at his first trial, following our remand defense counsel moved for an updated psychiatric evaluation and competency determination. The court granted the motion. Based on a subsequent evaluation and report by Dr. Paul Cotton, defendant stipulated that he was competent to

---

[10] Appellant identifies several other errors on appeal. Because we reverse on the basis of the Confrontation Clause violation, we do not address the remaining issues.

stand trial, and the trial court, based on the stipulation and report, issued an order, dated October 8, 2008, so finding.

¶ 46. In the period leading up to defendant's trial, defendant waffled on whether to present a diminished-capacity case at trial. On June 13, 2006, defendant personally filed a Rule 12.1 notice, stating his intent to "raise the issue of diminished capacity and offer expert testimony relating to a mental disease, defect, and other conditions bearing upon the issue of whether the defendant had the mens rea required for the offense charged." The notice indicated that defendant would offer the expert testimony of two mental health experts: Dr. Jonathan Weker and Dr. Albert Drukteinis, both of whom had previously evaluated defendant and determined that he suffered from paranoid delusions. Later, however, on January 27, 2009, six days before jury draw, defendant personally filed a "Withdrawal of Rule 12.1 Notice" with the trial court, stating, in part, that "[i]t makes no sense whatsoever for the Doctor to be telling the jury that the defendant suffers from delusions when the defense attorney is pursuing a self-defense claim and is attempting to convince the jury that the defendant's actions were reasonable."

¶ 47. Shortly thereafter, defense counsel filed a memorandum of law with the trial court objecting to defendant's withdrawal of his Rule 12.1 Notice and arguing that defense counsel controls whether or not to present a defense of diminished capacity, even where defendant objects to the use of such a defense at trial. On February 2, 2009, the first day of jury draw, the court and the parties, including defendant himself, engaged in an extended discussion about the issue. Defense counsel reiterated his view that the decision was a tactical one that was his to make, opined that the self-defense argument was defendant's weakest option, and expressed concern that in the absence of a diminished-capacity issue, counsel might be precluded from calling Drs. Weker and Drukteinis concerning defendant's paranoia because self-defense is predicated on what a reasonable person, not a delusional one, would believe to be a threat. See *State v. Shaw*, 168 Vt. 412, 418, 721 A.2d 486, 491 (1998) ("Both lawful self-defense and manslaughter . . . require that the defendant perceive a situation in a reasonable manner.").

¶ 48. The State, in contrast, argued that diminished capacity was akin to an insanity defense or an instruction on lesser-included offenses, both decisions within the defendant's control.

See *State v. Bean*, 171 Vt. 290, 302, 762 A.2d 1259, 1267 (2000); *In re Trombly*, 160 Vt. 215, 218, 627 A.2d 855, 857 (1993). Allowing defense counsel to present evidence of diminished capacity, the State asserted, would improperly undermine defendant's claim of innocence and interpose lesser-included offenses, in contravention of his right to control these decisions.

¶ 49. The trial court appeared to recognize the tension between allowing defense counsel to present evidence of diminished capacity while preserving defendant's right to decide whether to request charges on lesser-included offenses, observing: "What if we get to the end of trial, and I allow the testimony, because it's a decision for the Defense attorney to make as opposed to the defendant, and at the end of trial Mr. Tribble decides he does not want lesser included instruction, then we're left with testimony was there [sic], but it's [defendant's] decision with respect to the lesser included offenses." Throughout the court's various discussions of the issue, defendant continued to object clearly and on the record to presentation of diminished-capacity evidence.

¶ 50. Before the trial began, the trial court ruled that defense counsel could decide whether to present the diminished capacity evidence, explaining as follows:

> [T]he issue of diminished capacity . . . is one for the attorneys . . . . [Y]ou can go ahead with a diminished capacity defense and call witnesses . . . with the understanding that at the end of trial [defendant] still controls the decision as to whether or not to seek the lesser included offense instruction based on the testimony.

¶ 51. Accordingly, in the trial defense counsel called Drs. Weker and Drukteinis and elicited testimony regarding defendant's mental capacity. Dr. Weker testified that he had diagnosed defendant primarily with a "delusional disorder persecutory type" and secondarily with a "paranoid personality disorder." He stated that defendant was suffering from a delusional disorder at the time of the offense, which led him to believe that he was going to be attacked. He acknowledged that defendant was capable of forming an intent to kill, but that "his read" of the circumstances "would have been different from anybody else's" due to his belief that he was "in danger [and] under attack" and required to defend himself with deadly force. On cross-examination, Dr. Weker opined

that defendant's belief that Mr. Borello intended to kill him was delusional and baseless, and agreed that defendant "was not acting as a reasonable, ordinary, prudent person would act under the circumstances." Dr. Drukteinis offered similar testimony concerning defendant's paranoid personality disorder and delusional beliefs on the date of the incident.

¶ 52. The State submitted proposed instructions that included a charge on the lesser included offense of voluntary manslaughter. Defense counsel's comments at the charge conference indicate that defendant believed the lesser-included charge to be relevant to the element of "provocation," and apparently for this reason defendant raised no objection. The voluntary manslaughter instruction set forth two alternative grounds for the jury to mitigate murder to manslaughter: (1) that defendant's mental state was influenced by extenuating circumstances, such as sudden passion or great provocation that would cause a reasonable person to lose self-control; or (2) diminished capacity due to a mental condition. The jury found defendant guilty of second degree murder.

¶ 53. Defendant contends that the court erred in allowing defense counsel to raise the diminished-capacity defense over defendant's express objection. The claim presents a basic question of law that we review de novo. See *State v. Valyou*, 2006 VT 105, ¶ 4, 180 Vt. 627, 910 A.2d 922 (mem.).

¶ 54. The United States Supreme Court has recognized a criminal defendant's right — implicit in the Sixth Amendment — to decline the assistance of counsel and proceed pro se. *Faretta v. California*, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make [that] defense."). Concomitant with that right, the Supreme Court has "also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983); see also *Gonzalez v. United States*, 553 U.S. 242, 250 (2008) (reaffirming principle "that some basic trial choices are so important that an attorney must seek the client's consent in order

to waive the right").[11] At the same time, the Court has cautioned that the adversarial system "could not function effectively if every tactical decision required client approval." *Gonzalez*, 553 U.S. at 249 (quotation omitted). Many choices affecting the conduct of trial, "including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment" and trial strategy. *Id.* The defendant, therefore, must generally defer to the attorney's exercise of professional judgment concerning most of the everyday decisions at trial. No precise test separates fundamental decisions within defendants' control from strategic decisions left to counsel. 3 W. LaFave et al., Criminal Procedure § 11.6(c), at 796 (3d ed. 2007).

¶ 55. We have not had occasion to apply these principles to the specific type of decision at issue here — whether to present a diminished-capacity defense. In analyzing the question, we consider other closely related, but distinct issues that we and other courts have addressed. First, we have joined a majority of courts in concluding that the defendant retains ultimate authority over the decision to assert an insanity defense. In *Bean*, we considered "whether defense counsel had the right to try the case exclusively on an insanity defense theory over defendant's objection." 171 Vt. at 299, 762 A.2d at 1265. Stated more generally, the question was "whether the decision to raise an insanity defense is one involving the objectives of representation, left to the client, or the means of representation, properly exercised by the lawyer." *Id.* We held that it was improper for defense counsel to assert an insanity defense over defendant's objection, noting that the decision to assert an insanity defense was essentially a decision on "what plea to enter," *id.* at 300, 762 A.2d at 1266, a choice implicating fundamental trial "objectives" determined by the defendant. *Id.* at 299, 762 A.2d at 1265. Further supporting our conclusion was a recognition of the personal "stigma that an adjudication of mental illness entails," *id.* at 301, 762 A.2d at 1266, as well as the fact that an insanity defense may be fundamentally incompatible with a defense "on the merits." *Id.* at 301, 762 A.2d at 1267.

---

[11] As discussed in Part I, above, the final authority to waive one's Confrontation Clause rights is the defendant's, as well.

 ¶ 56. Our holding in *Bean* relied, in turn, on *Trombly*, where the question concerned the submission of a lesser-included-offense instruction to the jury. While acknowledging that "many trial tactics are ultimately defense counsel's call," we nevertheless concluded that "those that directly relate to the crime upon which the jury may rest its verdict generally are within the defendant's decisional control." *Trombly*, 160 Vt. at 218, 627 A.2d at 857. Thus, the defendant retains the final word on whether to submit lesser-included offenses to the jury. "Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide . . . ." *Id.* at 218, 627 A.2d at 856 (quotation omitted). We cautioned, however, that when a defendant's decision "is so ill-advised that it undermines a fair trial, the trial court may instruct the jury according to its considered view." *Id.* at 219, 627 A.2d at 857.

 ¶ 57. Finally, many courts have concluded that the decision to forgo an innocence-based defense, such as self-defense, in favor of seeking a less serious conviction based on diminished capacity is a choice implicating fundamental trial objectives that cannot be made by trial counsel over a defendant's express objection. In *State v. Lafferty*, 749 P.2d 1239 (Utah 1988), *aff'd on reh'g*, 776 P.2d 631 (1989), for example, the trial court rejected defense counsel's attempt to introduce evidence of defendant's mental state in an effort to reduce first-degree murder to manslaughter because the defendant "strongly objected" based on his belief that the evidence carried an implication of guilt inconsistent with his preferred defense of complete innocence. Rejecting the defendant's claim on appeal that the trial court erred in deferring to his wishes, the *Lafferty* court held that the defendant was entitled "to control the substance of his . . . defense," and found no error, therefore, in the trial court's allowing him "to rely solely on the defense of innocence [and] blocking his attorney's attempts to present a manslaughter defense." *Id.* at 1249. Other decisions are to similar effect. See, e.g., *People v. Bergerud*, 223 P.3d 686, 697 (Colo. 2010) (recognizing that, if defendant's attorneys had effectively pleaded him guilty to lesser homicide offenses "by focusing on his mental state," they "would have overstepped their bounds and appropriated fundamental choices committed to the defendant's decision alone"); *Commonwealth v. Weaver*, 457 A.2d 505, 506 (Pa. 1983) (explaining that "an accused offering evidence under the

theory of diminished capacity concedes general criminal liability, and the authority to make such a concession is solely that of the accused," and determining, therefore, that defense counsel was without authority to ignore defendant's insistence on presenting an innocence defense (citations omitted)); *State v. Woodland*, 945 P.2d 665, 668 (Utah 1997) (recognizing that defendant has the right to forgo "any defense based on insanity or diminished capacity"); see generally C. Slobogin et al., *The Criminal Defense Lawyer's Fiduciary Duty to Clients with Mental Disability*, 68 Fordham L. Rev. 1581, 1635 (2000) (observing that, "like the insanity defense, the diminished capacity defense is stigmatizing," and concluding that "the decision whether to present evidence of mental state should generally be left up to the client").

■■ ■■ ¶ 58. For similar reasons we conclude that defendant here — having been found competent to assist in his own defense — retained final authority over the decision to present a diminished capacity case. Plainly, as other courts have recognized, the fundamental right to maintain a plea of complete innocence would be impaired, if not eviscerated, if counsel were allowed, over defendant's objection, to assert a defense seeking a less serious conviction. Indeed, as the parties here clearly understood, evidence of defendant's delusional disorder directly undermined the self-defense theory that defendant preferred· by discrediting the claim that his perception of the threat was a reasonable one. The basic right to contend for outright acquittal that bars defense counsel from overriding a defendant's objection to instructing the jury as to lesser-included offenses applies with equal force to preclude the assertion of a theory, such as diminished capacity, that supports conviction on a lesser-included charge contrary to a defendant's express wishes. Moreover, like insanity, a defense of diminished capacity based on mental impairment is a highly personal and potentially stigmatizing one, and should remain the prerogative of an otherwise competent defendant in the final analysis. Accordingly, we conclude that the trial court here erred in authorizing defense counsel to assert the defense contrary to defendant's wishes.

*Reversed and remanded.*