2013 VT 39

## In re K.F., Juvenile

[72 A.3d 908]

No. 12-340

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed June 7, 2013

Motion to Amend Denied June 26, 2013

---

*Adele V. Pastor*, Barnard, for Appellant Father, D.B.

*William H. Sorrell*, Attorney General, Montpelier, *Jody A. Racht*, Assistant Attorney General, Waterbury, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Appellee Department for Children and Families.

*Kyle C. Sipples* of *Zuccaro, Willis & Sipples, P.C.*, St. Johnsbury, for Appellee Juvenile.

¶ 1. **Robinson, J.** Father appeals the termination of his parental rights (TPR) to his son K.F. on the grounds that the trial court erred in denying his motion for replacement counsel because his lawyer had a conflict of interest and he received ineffective assistance of counsel. We affirm.

¶ 2. K.F. is father's third child. The family division previously terminated father's rights to his two older children. In that case, the court's unchallenged findings were that father has an extensive criminal record, including drug offenses and domestic violence, and suffers from a mental and emotional disorder that impairs his ability to communicate and exercise good judgment. The court in that case found that father has resisted treatment

for his mental health issues. On appeal, this Court affirmed, rejecting father's claim that he received ineffective assistance of counsel. *In re M.B.*, No. 2011-347, 2012 WL 390688 (Vt. Jan. 26, 2012) (unpub. mem.), http://www.vermontjudiciary.org/d-upeo/upeo. aspx.

¶ 3. K.F. was born in April 2011. Father was incarcerated shortly thereafter. He was subsequently released subject to conditions prohibiting him from having contact with K.F.'s mother. Mother had also obtained a relief-from-abuse (RFA) order that prohibited father from having contact with her. K.F. was taken into the custody of the Department for Children and Families (DCF) in July 2011 based on an emergency care order. The factual basis was that mother and K.F. were in father's apartment in violation of the RFA and father's conditions of release, as well as in violation of mother's own conditions of release, and that K.F. was placed at risk of harm.

¶ 4. K.F.'s mother subsequently admitted that K.F. was CHINS. Following a disposition hearing in December 2011, all parties agreed to concurrent case plan goals of reunification with mother or TPR followed by adoption. The plan focused on K.F.'s mother because father was incarcerated and not considered a potential placement. Mother had significant mental health issues that impaired her ability to care for herself and a child and the case plan envisioned mother transitioning to the Lund Home . where eventually K.F. could be placed with her. The reunification failed and K.F.'s mother voluntarily relinquished her parental rights in April 2012.

¶ 5. DCF petitioned to terminate father's parental rights and the trial court held a final hearing in July 2012. At the beginning of the hearing, father told the court that he was receiving ineffective assistance of counsel.[1] Father argued that his lawyer had failed to pursue various strategies recommended by father to

---

[1] This was not father's first request for new counsel. In fact, father's counsel at trial was his fourth assigned attorney. Father first moved for a new attorney in August 2011, after which that attorney requested leave to withdraw. The court granted the request and assigned new counsel. Father moved again for a new attorney in January 2012, after which his lawyer sought leave to withdraw. The court granted the request and assigned a third attorney, who withdrew a few days later. Father's fourth, and final, attorney — whose representation forms the basis for father's appeal — was assigned in February 2012. In June 2012, father again moved for new counsel, but he withdrew the motion at a hearing in July 2012.

investigate and prepare for the trial, projected that she would not introduce or object to important evidence at trial, and said she would not advocate aggressively for him in the trial because she had been a foster parent and was thus sympathetic to DCF.

¶ 6. The court explained that it could not assess father's lawyer's effectiveness at trial until after the hearing, but did invite counsel to address father's concerns regarding her preparedness. Father's lawyer explained that she would, in the hearing, be raising many of the points identified by father, and that she had assessed and made decisions about the appropriateness of various issues raised by father based on her knowledge of the law. She indicated that she was prepared for trial.

¶ 7. As to the alleged conflict, she stated that she had never been a foster parent, but five years previously had adopted a child who had been in DCF custody. She said that she did not meet the child until after the prior parents' rights were terminated, and was not involved at all in the proceedings to terminate their rights. She confirmed that she had no current relationship with DCF. The court found no basis to remove counsel and the termination hearing proceeded.

¶ 8. Following the hearing, the court made the following findings by clear and convincing evidence, all of which are supported by the record. Father had been incarcerated for all but sixty-one days of the approximately sixteen months since K.F.'s birth and had no expectation as to the date of his release. Father did not engage in any parenting of K.F. during his incarceration. During the period when father was in the community, he had limited contact with K.F., seeing him approximately three times for one or two hours each, totaling no more than three-to-six hours. That was the extent of father's relationship with the child.

¶ 9. The court found in the prior TPR proceeding involving father's two older children that father had significant mental health issues that led to a predisposition to anger as a first response to disappointment and interfered with his own welfare and stable living. He also had a history of domestic violence, periods of repeated incarceration, and a chaotic life, lacking fundamental stability.

¶ 10. While in jail, father did not engage in counseling or mental health treatment. Before father's incarceration in July 2011, he did see a counselor, and that counselor testified that father impressed her as intelligent, motivated, sincere, and pleasant.

However, that counselor had never done any diagnostic testing in her career, was not treating father for any specific mental illness or diagnosis, and was serving more in the role as support person for father. The court found that the testimony of father's counselor, and father's appropriate behavior during the termination hearing, did not negate the findings from the prior TPR decision that father has a serious mental illness.

¶ 11. K.F., in the meantime, had been living in a foster home with a family that was prepared to adopt him since September 2011. He was well adjusted to the placement and had a strong loving bond with his foster siblings, his parents, and members of the extended family.

¶ 12. At trial, father's plan was for K.F. to remain in foster care and for mother to ultimately retain custody of K.F. so that all three could be reunited.

¶ 13. On the basis of these and other findings, the court concluded that father had not improved in his ability to parent K.F. and that this stagnation amounted to changed circumstances. As to the child's best interests, the court found that father had had no personal contact with K.F. in fourteen of the child's sixteen months since birth, and had no current, constructive role in the child's life. The court concluded that even if father was released from jail, he had significant other obstacles to address — including obtaining mental health treatment and housing — before being able to care for K.F.

¶ 14. The court explained that father was not a "bad man," but, rather, was a man who had many challenges in his life and who continued to experience mental illness that prevented him from providing safe and appropriate care to the child. The court stated:

> For all of his affection for and interest in [K.F., father] cannot provide for him, in the form of his presence, guidance, care and emotional support. . . . Even if [father] were no longer to be incarcerated, he would face significant and serious personal issues that as shown by this record, would prevent him from assuming and exercising a custodial parent's role for [K.F.] within any reasonable time period as relates to [K.F.'s] development and best interests.

Moreover, the court concluded that father's proposed plan, which relied on mother to take custody of the child after a period of

further foster care, was not possible because mother had relinquished her parental rights.

¶ 15. On the other hand, the court found that K.F. needs a safe, committed environment now and that K.F. has loving bonds to his foster parents and family that should not be disrupted. Thus, the court concluded that father would not be able to resume parenting K.F. within a reasonable period of time as measured from K.F.'s perspective, and granted termination.

¶ 16. On appeal, father does not challenge the court's findings or conclusions. He argues that the court erred in denying his request for replacement counsel due to counsel's alleged conflict of interest. Father also argues that his counsel provided ineffective assistance warranting reversal.

¶ 17. As to his request for replacement counsel, father alleges that his counsel's adoption of a child from DCF five years ago created a conflict that mandated her removal. In support, father cites Vermont Rule of Professional Conduct 1.7. According to father, his lawyer's prior adoption of a child who had been in DCF custody made the lawyer sympathetic to DCF and unable to provide zealous representation to father.

¶ 18. We discern no conflict of interest that precluded father's attorney from representing him. Rule 1.7 deals with a lawyer's obligation to avoid concurrent conflicts of interest, including not representing a client when there is a "significant risk" that the representation is "materially limited . . . by a personal interest of the lawyer." V.R.Pr.C. 1.7(a)(2). The comments to the rules explain that such personal interest conflicts may include a lawyer's business or employment interest with an opponent's client or law firm, a lawyer's financial interest in an opponent, or a lawyer's personal connection to other lawyers in the action. Here, there is simply no conflict. Father's attorney had no personal interest in the outcome of the case that prevented her from providing father with adequate representation. Counsel had not represented DCF in the past and had no current or past relationship to DCF beyond counsel's adoption five years previously of a child who had been in DCF custody. This created no inherent bias that would prevent counsel from adequately representing father.

¶ 19. In a prior case, we addressed whether a judge who was an adoptive parent was disqualified from adjudicating whether

adoptees were entitled to disclosure of adoption information. *In re Margaret Susan P.*, 169 Vt. 252, 733 A.2d 38 (1999). We rejected the conflict claim, explaining that "[w]e do not believe that personal and family circumstances are appropriate considerations on which to presume bias or partiality." *Id.* at 256-57, 733 A.2d at 42. Similarly, here, the simple fact of counsel's family circumstances without any showing of a current connection to DCF or this case was an insufficient reason to presume counsel's inability to represent father, and the court did not abuse its discretion in denying father replacement counsel on this basis. See V.R.F.P. 15(f)(2)-(3) (allowing court to grant appointed counsel's motion to withdraw when there is conflict of interest or "good cause" is shown).

¶ 20. Moreover, the record does not support father's suggestion that his lawyer's presumed sympathy for DCF undermined her zeal in representing him. The record supports the trial court's findings concerning his counsel's representation:

> It is the observation of the court that counsel's . . . conduct as [father's] attorney serves to confirm her representation to the court that she had conferred adequately with [father] and was prepared to provide effective representation for him in the course of the proceedings. Counsel engaged fully in asserting objections to examination of witnesses and introduction of exhibits, with reasoned and lawful basis; she engaged in effective examination and cross-examination of witnesses; she presented reasoned and detailed argument with reference to the record as to the case outcome urged on behalf or [father]. She conferred with [father] throughout the proceedings in the courtroom. Opportunity was provided for [father] to communicate with his attorney as to any specific concerns that he appeared to have from time to time, and for his attorney to then communicate to the Court those concerns, or positions on [father's] behalf as she might choose.

¶ 21. Next, father argues that he received ineffective assistance of counsel and is entitled to a new hearing. This Court has yet to address the question of whether an ineffective-assistance-of-counsel claim may be raised to challenge a TPR decision. See *In re M.B.*, 162 Vt. 229, 233 n.3, 647 A.2d 1001, 1003 n.3 (1994)

(rejecting father's ineffective assistance claim, but expressing no opinion "on viability of such a claim, or of the appropriate procedure to hear it"). The standard for evaluating a claim of ineffective assistance of counsel in the context of a criminal proceeding is well established. "To establish a claim of ineffective assistance of counsel, the father must show by a preponderance of the evidence that (1) counsel's conduct fell short of the prevailing standard of a reasonably competent attorney, and (2) this incompetence was sufficiently prejudicial to create 'a reasonable probability' of a different result." *Id.* at 234, 647 A.2d at 1004 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 22. As we have done previously, we do not decide in this case whether a parent in a TPR case has a statutory or constitutional right to challenge the effectiveness of counsel because we conclude that even if such a challenge can be brought, and even accepting for the sake of argument father's allegations about counsel's shortcomings, father in this case cannot meet the *Strickland* standard. See *In re S.W.*, 2008 VT 38, ¶ 7, 183 Vt. 610, 949 A.2d 442 (mem.) (declining to reach question of whether ineffective-assistance claim could be brought where mother had failed to show counsel's performance was below standard of practice or that she was prejudiced by any incompetence).[2]

¶ 23. We consider each of the specific actions, or alleged inactions, father raises in support of his claim of ineffective

---

[2] Although we have not yet decided whether parents facing termination of their parental rights have a statutory or constitutional right to challenge the effectiveness of counsel, we are mindful that our statutes and rules currently do not prescribe any procedure for addressing such claims of ineffective assistance in the event that they are cognizable. Many courts allow or require parents to raise a claim of ineffective assistance on direct appeal, subject to the possibility of remand for an expedited evidentiary hearing if the appellate court concludes that one is required. See, e.g., *N.J. Div. of Youth & Family Servs. v. B.R.*, 929 A.2d 1034, 1040 (N.J. 2007) (where ineffective assistance claim not resolvable on basis of appeal record alone, appeal court should remand to trial judge for expedited hearing within fourteen days, followed promptly by oral decision on record and appellate briefing within seven days). Other courts have approved the use of post-judgment motions as the appropriate method to raise ineffectiveness claims. See, e.g., *Ex parte E.D.*, 777 So. 2d 113, 116 (Ala. 2000) (ineffective assistance claims can be made through post-judgment motions pursuant to civil rule 60(b)(6)). We refer to the Advisory Committee on Rules for Family Proceedings the question of what procedure would apply if we concluded that parents in TPR cases had a legal right to effective counsel. That committee should propose a rule that best ensures finality and timely resolution of TPR claims consistent with parents' legal rights.

assistance. First, he reiterates his claim that his lawyer had a conflict of interest. We have addressed the conflict question above.

¶ 24. Second, father argues that counsel: failed to present evidence to rebut certain findings about the scope of his criminal history made by the court in the prior TPR decision involving his older two children and adopted by the trial court in this case; failed to adequately pursue a kinship placement in his family and to highlight DCF's failure to explore certain kinship placements within his family; did not present evidence that, by handwritten note allegedly passed by mother to father during the hearing, and then presented to father's lawyer, mother recanted her prior allegations of sexual assault and burglary by father; and failed to sufficiently challenge the DCF caseworker's bias against father.

¶ 25. In support of his arguments, father relies heavily on items not in the record before the trial court.[3] Father has submitted a Vermont criminal history report, seeking to demonstrate that father did not have as extensive a criminal history, or one involving drugs or domestic violence, as found by the court in the prior TPR involving father's older children. Father also submits several DCF policy statements in arguing that the caseworker did not adequately pursue possible kinship placements for K.F. Finally, father submits a purported handwritten note from mother to father, as well as an affidavit signed by mother *after* the trial, to demonstrate that K.F.'s mother recanted her allegations of sexual assault against father.

¶ 26. The State has moved to strike portions of father's printed case because the information was not part of the record considered by the family division. In the alternative, the State seeks to supplement the record with evidence from the prior TPR decision involving father's older children. Ordinarily, this Court's "review is confined to the record and evidence adduced at trial." *Hoover v. Hoover*, 171 Vt. 256, 258, 764 A.2d 1192, 1193 (2000); see V.R.A.P. 10(a) (confining record on appeal to items filed in trial court, court docket entries, and any transcript of proceedings below). Because the items proffered by father were not admitted below, we grant the motion to strike these portions of father's printed case. See *In re Estate of Perry*, 2012 VT 9, ¶ 13, 191 Vt. 589, 39 A.3d 1060

---

[3] Of course, one reason an ineffective-assistance claim generally cannot be brought on direct appeal in a criminal proceeding is due to the need to develop an evidentiary record to support the claim. See *State v. Davignon*, 152 Vt. 209, 222, 565 A.2d 1301, 1308 (1989).

(mem.) (granting motion to strike affidavits not filed with trial court).

¶ 27. However, even considering father's submissions as a proffer of the evidence he would muster in support of his ineffective-assistance claim, father cannot establish an ineffective-assistance claim on this record.[4] *In re S.W.*, 2008 VT 38, ¶ 7 (rejecting ineffective-assistance claim where parent failed to show that any ineffectiveness affected outcome of proceeding).

■ ¶ 28. The court's termination decision was based on its conclusions that father's progress had stagnated and that termination was in K.F.'s best interests. None of the evidence proffered by father alters the findings that support these conclusions. The proposed evidence does not negate the finding that father had a criminal history, including a conviction for assaulting a domestic partner, or that his former partner had obtained an RFA order against him. Whatever the extent and nature of father's criminal record, the court's unchallenged finding was that father was incarcerated for most of K.F.'s life, was not bonded with K.F., and lacked the skills to parent K.F. In addition to father's incarceration and the uncertainty of his release at the time of the final hearing, the court found that other challenges — such as father's lack of housing, need for mental health treatment, and need to gain and exercise appropriate self control — were barriers to father's ability to parent K.F. within a reasonable period of time. For these reasons, we conclude that even if his lawyer had introduced evidence that the scope of father's criminal record was somewhat less extensive than found by the trial court, that evidence would not have altered the findings on which the trial court based its decision to terminate father's parental rights.

■ ¶ 29. As to the kinship placement,[5] the availability of such a possible placement does not impact the court's critical unchallenged finding — that father would not be able to parent K.F. within a reasonable period of time. We have explained that DCF's

---

[4] For purposes of this analysis we do not reach the question of whether counsel's failure to offer this evidence at trial actually amounted to conduct that fell below a reasonable standard of competence.

[5] We note that the matter of the availability of kinship placements was litigated at trial, and in its decision the family court concluded that DCF had engaged in reasonable efforts to identify and investigate potential kinship placements, including one of father's sisters.

diligence in locating a kinship placement is not relevant to the court's decision at a termination hearing. In assessing whether to terminate father's parental rights, the trial court was not required to make specific findings on the potential parental fitness of father's other family members. See *In re S.W.*, 2008 VT 38, ¶ 13 (rejecting father's argument that DCF's failure to more actively pursue kinship placements precluded termination). The only issues before the court at termination are whether there has been a substantial change in material circumstances and whether termination is in the child's best interests. *Id.* Having concluded by clear and convincing evidence that termination of father's parental rights was in K.F.'s best interests, the court was not required to address possible alternative placements for the child. *In re T.T.*, 2005 VT 30, ¶ 7, 178 Vt. 496, 872 A.2d 334 (mem.). Evidence about potential kinship placements within his family would have been, accordingly, irrelevant to the court's decision.

■ ■ ¶ 30. Assuming for the purposes of this discussion that mother did pass father a note mid-trial recanting certain criminal allegations against him, and that he passed it to his lawyer, the question of whether to offer that evidence at trial was a strategic judgment for the lawyer to make. See *State v. Tribble*, 2012 VT 105, ¶ 54, 193 Vt. 194, 67 A.3d 210 ("The defendant . . . must generally defer to the attorney's exercise of professional judgment concerning most of the everyday decisions at trial."). Mother's allegations against father were not a central issue in the case. Father's lack of relationship with the child, his ongoing incarceration, his lack of parenting skills, the various obstacles to his ability to resume a parental relationship, and the child's need for stability and adaptation to the family with whom he had spent most of his life were the focus of the evidence. The alleged recantation was handwritten, unsworn, and itself potentially suspect given mother's situation and the fact that the purported communication came not through counsel but through mother directly to father. Given these circumstances, we conclude that counsel's judgment not to seek to introduce the alleged recantation could not have supported an ineffective-assistance claim.

■ ¶ 31. Finally, father faults his lawyer for not thoroughly exploring the DCF caseworker's antipathy to him. The transcript reflects that father's lawyer thoroughly and aggressively cross-examined the DCF caseworker on a host of subjects, including

extensive questioning on her failure to pursue kinship placements within father's family. In fact, the trial court sustained an objection at one point that counsel's questioning of the witness was argumentative. Given this record, father cannot demonstrate that his lawyer failed to appropriately raise questions about the caseworker's testimony.

*Affirmed.*

¶ 32. **Dooley, J.,** concurring. I concur, in large part because we are referring the issue of how we or the trial courts should address procedurally an ineffective-assistance-of-counsel claim in a termination of parental rights (TPR) case should we agree that such a claim is available. I stress that I have not yet decided that we should allow ineffective-assistance-of-counsel claims in TPR cases. In making the referral to the family rules committee, I am stating my skepticism that there is a way to determine whether the assistance of counsel is ineffective in a timely way that is consistent with the permanency needs of the child should termination be upheld. My skepticism arises out of our deficient record in resolving ineffective-assistance-of-counsel claims in criminal cases.

¶ 33. We allow ineffective-assistance-of-counsel claims in criminal cases only in post-conviction relief (PCR) proceedings that collaterally attack the conviction. We have seen many of these cases on appeal. Some are resolved on summary judgment — the equivalent to the claims in TPR cases that would require no factual development. But many are not. Last year, we saw one that had remained in the superior court for nine years, see *In re Crannell*, 2012 VT 85, 192 Vt. 406, 60 A.3d 632, and never moved beyond disputes over whether the petitioner would receive appointed counsel in the PCR.[6] It is not unusual to see such cases take three years in the trial court. See *In re Combs*, 2011 VT 75, ¶ 2, 190 Vt. 559, 27 A.3d 318 (mem.). *Combs* is an example of how protracted PCR proceedings can become. In that case, this Court has twice reversed superior court judgments for the State, and the case is again in the trial court.

¶ 34. The extended time period it requires to resolve claims of ineffective assistance of counsel is inevitable in many cases

---

[6] I am also concerned that the battle over providing representation will migrate to TPR cases and eat up major time.

because of the nature of the petitioner's burden of proof. Petitioner must show that the assistance of the lawyer in the PCR fell below the standard of effectiveness of reasonably competent counsel. See *In re Russo*, 2010 VT 16, ¶ 16, 187 Vt. 367, 991 A.2d 1073 (laying out test for ineffective assistance of counsel). In most cases, the petitioner may do so only through an expert witness. See *In re Grega*, 2003 VT 77, ¶ 16, 175 Vt. 631, 833 A.2d 872 (mem.) ("Only in rare situations will ineffective assistance of counsel be presumed without expert testimony."). At best, locating, recruiting and preparing such a witness will take months. Even a court wholly committed to expediting these cases will find it impossible to prevent extended delay. I am drawn to the procedure implemented in cases like *New Jersey Division of Youth & Family Services v. B.R.*, 929 A.2d 1034 (N.J. 2007), that create a very short time limit in which to make a full evidentiary presentation of the ineffective-assistance-of-counsel claim, but find that time limit wholly inadequate to prepare and present a meritorious claim. Indeed, the short time limit predetermines the result; it can be honored only for ineffective ineffective-assistance-of-counsel claims.

¶ 35. Perhaps the Advisory Committee on Rules for Family Proceedings can find an answer to my concerns, and I look forward to the results of its work. But if the answer is to import our track record on addressing ineffective-assistance-of-counsel claims from criminal cases to TPRs, I am unlikely to be persuaded that we should open this door at all.

¶ 36. I am authorized to state that Justice Burgess joins this concurrence.