VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      24-AP-166



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

OCTOBER TERM,   2024

| | |
|---|---|
| In re K.C., Juvenile | }   APPEALED FROM: |
| (K.C., Mother\*) | } |
| | }   Superior Court, Chittenden Unit, |
| | }   Family Division |
| | }   CASE NO. 22-JV-00683 |
| |      Trial Judge: Michael J. Harris |

In the above-entitled cause, the Clerk will enter:

Mother appeals a family division order terminating her parental rights in her daughter K.C., born in August 2021.[1]  She argues that the court erred in concluding that the State demonstrated, by clear and convincing evidence, that the termination of her parental rights was in K.C.'s best interests.  We affirm.

In May 2022, when K.C. was eight months old, the State filed a petition seeking a determination that she was a child in need of care or supervision (CHINS).  The supporting affidavit alleged that K.C. was at risk of harm because mother was struggling with substance use and had allowed unsafe individuals into her home, and father was incarcerated in Pennsylvania and unable to provide care for K.C.  K.C. was originally placed in the conditional custody of mother's friends.  However, the conditional custody order was vacated before the end of May after one of the custodians reportedly brought K.C. to mother's home, a violation of the order's conditions, and accepted illicit drugs from mother.  K.C. was subsequently placed in the custody of the Department for Children and Families (DCF).  Mother stipulated that K.C. was CHINS on the date of the State's petition because she had relapsed in the use of substances and allowed others to sell them in her home, leading to an incident in which one of these individuals threatened mother and K.C. with a firearm.

Approximately one year later, in May 2023, the State filed petitions to terminate parents' rights in K.C.  The trial court held hearings on the matter on November 21, 2023, and April 1 and 10, 2024.  Though mother received notice and was represented by counsel, she failed to appear at any of the three hearing dates.  The court subsequently issued a written decision in which it made the following findings by clear and convincing evidence.

---

[1] Father's rights in K.C. were terminated in the same order.  Because he did not appeal, this decision focuses on the procedural background relevant to mother.

At the time of the CHINS petition, mother was struggling with substance use and living with unsafe individuals. She entered residential treatment in May 2022 but was discharged three days later, without completing the program, after engaging in aggressive and volatile behavior including throwing a chair. In June, mother completed a five-day detox program but did not engage in follow-up care, telling DCF that she did not wish to pursue further substance-abuse treatment and believed that avoiding triggering people and places would be sufficient to prevent any future illicit use of substances.

Between June and August of 2022, mother had very little contact with K.C. In July, mother told DCF that she wanted to resume visits with K.C. but was again struggling with substance use, including the use of intravenous crack cocaine. She explained that there were needles around her home and that individuals who could trigger her use were present there. She also indicated that she was not in any treatment program and declined DCF's offers of treatment support.

Mother again requested contact with K.C. in late August and was told that she needed to first meet with DCF due to the agency's concerns over her admitted substance use. She had one supervised visit at the DCF office. DCF discussed setting up twice-weekly supervised visits at the office, but mother was unable to commit to a visitation schedule. At around the same time, mother faced eviction proceedings due to concerns about substance use and distribution in her unit or building. To preserve her housing-voucher eligibility, mother voluntarily vacated her apartment with no other stable housing in place. DCF provided mother with supports and contacts to pursue new, stable housing away from individuals who might trigger her substance use. In addition, the DCF worker assigned to K.C.'s case encouraged mother to consider participating in family treatment court, an ongoing commitment that provides a wide range of supports including substance-use-treatment and mental-health-treatment support and coordination.

In August 2022, the court adopted a disposition case plan with a goal of reunification between mother and K.C. within six to nine months, to be extended to one year if mother successfully engaged in family treatment court as anticipated. Mother's action steps included: immediately seeking detoxification services, a substance-use assessment, and medically assisted treatment; identifying and maintaining safe and stable housing and working with appropriate supports to ensure her home remained free of unsafe individuals; establishing regular contact with DCF and returning any communications from the agency within twenty-four hours; creating a supervised contact schedule and accessing parenting supports; and signing releases to ensure DCF could monitor mother's engagement with these goals.

Mother knew that the family treatment court program would provide supports to help her reunify with K.C. However, she never completed the screening paperwork required to participate, indicating that she was too busy and did not have time. She never entered the program.

In November 2022, mother reported she had been hospitalized after a new boyfriend assaulted her, and that she was still not receiving substance-use treatment. She did not respond to DCF's request for a meeting to discuss post-assault services.

Mother never worked with DCF to create a schedule for supervised visits with K.C. She did contact DCF on several occasions to arrange single supervised visits, but only attended one or two of the three visits she scheduled. Her last visit with K.C. was in December 2022.

Mother's contact with DCF was initially sporadic and ultimately ceased entirely. In January 2023, she indicated that she planned to participate in a residential treatment program. However, DCF heard nothing further and never received confirmation as to whether this occurred. In February 2023, mother called for an update and was informed that she needed to meet with the DCF worker. She did not do so. Though DCF subsequently attempted to reach out to mother through multiple modes of communication, she had no contact with the agency after that time.

Despite DCF's offers of support, there was no indication that mother ever obtained stable housing or ceased living with individuals engaged in substance use—an acknowledged trigger for her own use. Similarly, the agency received no information suggesting that mother had ceased using illicit substances or sought out further substance-use treatment or services. There were no identified providers who could help DCF assess mother's sobriety and suitability for progression of visits. Mother never provided any releases, either because she never worked with any providers or because their records would show that she did not comply with a treatment program.

After K.C. entered DCF custody, the agency discovered that she had special medical needs. K.C. was diagnosed with asthma and prescribed two inhalers for use in different circumstances. In January 2023, tubes were placed in her ears in connection with her recurrent ear infections.

K.C. had several placements while in DCF custody. As of the final termination hearing, she had been in her current foster home for one year, not including a period during which she had gradually increasing contact time with her foster parents while transitioning into their home. Her foster parents were attending closely to her medical needs, providing her with a nurturing, consistent, and loving setting, bringing her to child-oriented activities, and had integrated her into their extended families. K.C. met age-appropriate developmental milestones while in their care. She began referring to her foster parents as her mother and father, and they became her source for comfort and stability. The foster parents were committed to adopting K.C. if freed for adoption.

Based on these findings, the trial court concluded that there had been a substantial change in material circumstances since the initial disposition order. Mother had stagnated in her ability to care for K.C., failing to make even initial progress toward the case-plan goal. The court then weighed each of the best-interests factors set forth at 33 V.S.A. § 5114(a). It observed that due to mother's failure to maintain contact with K.C., the two had no current or recent relationship and mother played no constructive role in K.C.'s life. Father remained in Pennsylvania, and K.C. had never met him in person due to factors within father's control. K.C. did have virtual visits with father beginning in October 2023, but these were not conducive to establishing an initial bond with a very young child. In contrast, K.C. had developed close, supportive, and stable relationships with her foster parents. She was well-adjusted to their home and community, and she viewed them as her parents—the people "who provide her emotional grounding, comfort in times of need or distress, and long[-]term stability of care." Most importantly, the court recognized, mother's failure to maintain regular contact with K.C. or make progress in addressing any of her action steps created "serious doubt" as to her ability to resume parenting K.C. within a reasonable time. The court noted that K.C. was a young child, had been in DCF custody for almost two years, and needed permanency. It concluded that termination of parental rights was in K.C.'s best interests and granted the State's petitions. This appeal followed.

When the State moves to terminate parental rights after an initial disposition order, the family division must engage in a two-step analysis. In re M.P., 2019 VT 69, ¶ 24, 211 Vt. 20. It first considers whether there has been a change in circumstances sufficient to justify modifying the existing order. In re B.W., 162 Vt. 287, 291 (1994); 33 V.S.A. § 5113(b). Where this threshold is met, the court goes on to determine whether termination of parental rights is in the child's best interests by weighing the four factors set forth at 33 V.S.A. § 5114(a). In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450. "The State has the burden of proof at both stages and, as to each point, must meet its burden by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108 (quotation omitted).

On appeal, mother does not challenge the court's conclusion that there was a change in circumstances following the initial disposition order. However, she contends that the State's evidence regarding K.C.'s current circumstances and paternal extended family—as relevant to the court's analysis under 33 V.S.A. § 5114(a)(1) and (2)—was insufficient to support the conclusion that termination of mother's parental rights was in K.C.'s best interests under a clear-and-convincing evidence standard.

The role of this Court "is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion" in terminating parental rights. In re J.M., 2015 VT 94, ¶ 8, 199 Vt. 627 (quotation omitted). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9 (quotation omitted). Where the standard of proof is clear and convincing evidence, "[t]he test on review is . . . whether the factfinder could reasonably have concluded that the required factual predicate was highly probable." In re N.H., 168 Vt. 508, 512-13 (1998). Assessed under these standards, we find no basis to disturb the trial court's decision.

At the outset, it is important to note the relative weight of the two best-interests factors on which mother's argument turns. Under § 5114(a)(1), the court was called to consider K.C.'s "interaction and interrelationship . . . with . . . her parents, siblings, foster parents, if any, and any other person who may significantly affect [her] best interests." Pursuant to § 5114(a)(2), it had to weigh K.C.'s "adjustment to . . . her home, school, and community." However, the first and second factors are not necessarily dispositive in a best-interests analysis. See In re G.L., 2024 VT 60, ¶ 52. Rather, as the trial court explicitly recognized, the "most important" of the four statutory factors is the third: the likelihood that the parent will be able to resume parental duties within a reasonable time, measured from the perspective of the child. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325; 33 V.S.A. § 5114(a)(3).

Mother does not challenge the trial court's analysis of this "critical" third factor. In re B.M., 165 Vt. 331, 336 (1996). As the court found, despite DCF's offers of support, mother did not "even show initial progress" in addressing the concerns that led to the CHINS merits determination. It accorded particular significance to mother's failure to demonstrate that she could maintain sobriety or sustained participation in substance-use treatment, as well as her inability or unwillingness to be a consistent presence in K.C.'s life and the resulting lack of any relationship or bond between mother and child. The court concluded that in light of K.C.'s young age, her special medical needs, the instability she had already experienced in her life, and the twenty-three months she had already spent in DCF custody, it was unreasonable to require her "to wait indefinitely to see if or when her parent might develop the means, skills[,] and ability to safely parent and maintain a consistent involvement in [her] life." See In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 ("The reasonableness of the time period is measured from the

4

perspective of the child's needs, and may take account of the child's young age or special needs.") (citation omitted). It is in this context that we consider mother's arguments relative to the first and second best-interests factors.

First, mother contends that the testimony of K.C.'s foster mother at the November hearing was too limited to support the court's conclusion because it was "extremely brief" and K.C. had only been placed in the foster home for seven months at the time. For multiple reasons, we find this argument without merit.

To begin, we note that—given the paramount importance of the third best-interests factor, as discussed above—"the availability of an alternative placement is not a precondition to terminating parental rights." In re J.M., 2015 VT 94, ¶ 11; see also In re G.L., 2024 VT 60, ¶ 53 (noting "how far removed any information pertaining to a child's foster placement is from the pivotal issues in a termination proceeding"). This was "not a custody case in which the family court is weighing which parent or guardian will be best able to serve the needs of the child," but rather "a legislatively created termination proceeding in which the court is required to weigh specified statutory factors in determining whether to grant a petition for termination of residual parental rights." In re S.B., 174 Vt. 427, 428 (2002) (mem.). Such a petition may be granted "if it is in the best interests of the child as determined by weighing [the statutory factors]," none of which "preclude[] the court from terminating the parental rights until a permanent placement is available." In re L.A., 154 Vt. 147, 160 (1990). Thus, the court could conceivably have terminated mother's parental rights even if the State had not shown that K.C. was thriving in a foster placement that offered stability and permanency. However, in this case, the State's evidence amply supported the court's findings to this effect and its corresponding analysis under § 5114(a)(1) and (2).

Mother's characterization of the foster mother's testimony as "very limited" is not supported by the record. The foster mother testified to the following in November 2023. She and her husband first met K.C. in February of that year and began visiting with her multiple times per week in anticipation of her transition into their care. By mid-March, they were having overnight visits, and K.C. came to live with them full-time in the beginning of April. She is the only child in their home and has her own bedroom there. The transition was "incredibly smooth," and K.C. quickly "took to" her foster parents. To maintain consistency in her life, they continued bringing her to the same daycare she previously attended. K.C. did very well at daycare and, based on her progress and eagerness to learn, advanced two levels in the program while in the care of her foster parents. K.C. could recite the full alphabet, knew her numbers and colors, and was meeting her developmental milestones. Her foster parents had taken her to multiple medical appointments and are closely attuned to her special medical needs. K.C. is a happy child who loves coloring, being outside, going on adventures, and singing. She spends a great deal of time with her foster parents' relatives and has become a part of their respective extended families. The foster parents had taken K.C. on family vacations and brought her to museums and zoos. Without prompting, K.C. began calling them "Mom" and "Dad." She is "incredibly bonded" to them, and they are "one hundred percent" committed to adopting her if freed for adoption. The foster mother explained that she and her husband are "all in" and are physically, mentally, emotionally, and financially capable of raising K.C. to adulthood. This uncontroverted testimony supports the family division's findings about K.C.'s relationship to her foster parents and their extended families and her adjustment to home and community. See 33 V.S.A. § 5114(a)(1), (2); cf. In re N.H., 168 Vt. at 512 (explaining that evidence may be "clear and convincing" even if contradicted or impeached).

Moreover, contrary to mother's assertion, the foster mother's testimony was not the only evidence the State offered on these points. The two DCF workers assigned to K.C.'s case also testified to their observations of her adjustment to her foster home, and their testimony was consistent with the foster mother's. Though mother seems to suggest that the evidence became stale in the months that passed between the foster mother's testimony and the conclusion of the proceeding, we note that one of the DCF workers testified at the final hearing on April 10. At that time, the DCF worker explained that K.C. had a "really positive" relationship with her foster parents. She was very attached to and loving toward them, and was doing "really, really well" in their home. The foster parents continued to attend carefully to K.C.'s special medical needs and had recently taken her to a pulmonologist. K.C. was also continuing to advance at daycare. This evidence, too, provided abundant support for the court's analysis of the first two best-interests factors.

As a result, mother has not shown that the court erred in concluding that the State demonstrated, by clear and convincing evidence, that K.C. had formed a parental bond with her foster parents, who provided her with stability and consistency, integrated her into their extended families, met her medical and other needs, and were committed to adopting her if freed for adoption. These findings, in turn, supported the court's analysis of K.C.'s best interests under § 5114(a)(1) and (2). See, e.g., In re T.T., 2005 VT 30, ¶ 6, 178 Vt. 496 (concluding that evidence relevant to first two best-interests factors supported termination where "foster parents had cared for T.T. for most of his young life, nursing him through needed physical therapy and becoming his psychological parents" and wished to provide him with necessary permanence).

Finally, mother argues that the family division lacked sufficient evidence regarding K.C.'s paternal extended family to support its conclusion that termination of mother's parental rights was in K.C.'s best interests. Specifically, she observes that father testified that either he or his family members could provide permanency for K.C., but the "thread" of this testimony was essentially lost between the November 21, 2023 and April 10, 2024 hearings.[2] Mother asserts that the relevant statutory provisions must be construed in connection with the purpose "to preserve the family," and contends that, had the court denied the petition, the State would have had more time to complete a home study for father's aunt in North Carolina.

This argument is also unsupported by the record. At the time of K.C.'s birth, father was incarcerated in Pennsylvania. He remained so during the first termination hearing in November 2023, where he testified that his mother told him that his aunt, who lived in North Carolina, would be willing to care for K.C. until his release or take "temporary custody if all else fails." When the direct examination of father by his attorney continued at the next hearing in April 2024, he had been released from prison and testified that he wanted K.C. to come live with him at his home in Pennsylvania. K.C.'s attorney asked father about his aunt in North Carolina, and he agreed that she is sixty-seven years old and had never met K.C. Because § 5114(a)(1) directs the court to consider the child's "interaction and interrelationship" with persons who may significantly affect their best interests, it is not clear how additional testimony regarding father's aunt could have materially impacted the analysis: father agreed that K.C. and his aunt had never met, and thus had no interaction or relationship. There was no evidence that K.C. had any connection to any other members of father's extended family, and mother does not challenge the court's conclusion that, for multiple reasons, father himself was unable to offer K.C. timely permanency.

_____

[2] In making this argument, mother neglects to note that an intervening hearing was held on April 1, 2024, and that the continuation of father's November testimony began on this day.

To the extent mother suggests that the court should have considered the possibility that K.C. could be placed with father's aunt in its best-interests analysis, she has not indicated whether or how she preserved this argument for appeal. See In re C.H., 170 Vt. 603, 604 (2000) (mem.) (declining to reach parent's argument on appeal because it was not raised before family division); V.R.A.P. 28(a)(4)(A) (providing that appellant's principal brief must indicate how each issue presented was preserved). In any event, this contention is at odds with the case law. "We have repeatedly rejected the claim . . . that the court must consider less drastic alternatives to termination once it has determined [a] parent to be unfit and unable to resume his or her parental responsibilities." In re G.F., 2007 VT 11, ¶ 20, 181 Vt. 593 (mem.). "Having concluded by clear and convincing evidence that termination of . . . parental rights was in [K.C.'s] best interests, the court was not required to address possible alternative placements for the child." In re K.F., 2013 VT 39, ¶ 29, 194 Vt. 64. Just as we explained in In re K.F., "[e]vidence about potential kinship placements within [father's] family would have been, accordingly, irrelevant to the court's decision." Id.

The State's evidence supported the trial court's finding that mother was unlikely to be able to resume parenting K.C. within a reasonable time given K.C.'s young age and need for permanency. It also supported the court's finding that K.C. was bonded to her foster parents and adjusted to their home and her community. Mother has not shown that the court abused its discretion in concluding that the State had shown, by clear and convincing evidence, that termination of mother's parental rights was in K.C.'s best interests under the relevant statutory factors.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
William D. Cohen, Associate Justice

_____
Nancy J. Waples, Associate Justice

7